

**SEALED**

# UNITED STATES DISTRICT COURT

for the

Western District of Virginia



MAR 1 4 2018

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

| In the Matter of the Search of | ) |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. 4:18mj00047 |
| FACEBOOK USER ID 100007404642812 | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated herein by reference)

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated herein by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1959(a) | Violent Crime in Aid of Racketeering Activity |

The application is based on these facts:

Please see attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of _180_ days (give exact ending date if more than 30 days: _09/10/2018_ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI - TFO Devin Taylor
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _03/14/2018_

_____
*Judge's signature*

City and state: Charlottesville, Virginia

The Honorable Joel C. Hoppe, U.S. Magistrate Judge
*Printed name and title*



SEALED

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

MAR 1 4 2018

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID:<br><br>**100007404642812**<br><br>THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 4:18mj00047<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Devin Taylor, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information associated with certain Facebook user IDs that are stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user ID, including the content of the subscriber's or customer's account.

2.    I am an Investigator with the Pittsylvania County Sheriff's Office based in Chatham, Virginia. I have been a Task Force Officer with the Federal Bureau of Investigation ("FBI") since October 2016 and currently work in that capacity while employed with the

1

Pittsylvania County Sheriff's Office. Prior to serving in the role of an Investigator, I served as a Deputy Sheriff employed by the Pittsylvania County Sheriff's Office. Prior to my appointment to Deputy Sheriff and then promotion to Investigator, I served as a crime analyst with the Pittsylvania County Sheriff's Office, where my duties encompassed analyzing digital records from cellular devices, to include search warrant returns from various social media platforms, such as Facebook.

3.     I have had extensive training at the Piedmont Regional Criminal Justice Training Academy, where I completed entry level law enforcement training and hold a Virginia Law Enforcement Certification. I am also a certified Instructor with the Piedmont Regional Criminal Justice Training Academy, which allows me to teach Virginia Department of Criminal Justice Services curriculum to upcoming officers enrolled in training academies in the Commonwealth of Virginia.

4.     I have also been trained on the investigative use of cellular and other electronic devices, to include performing forensic examinations on such devices which I hold numerous certifications. In addition, I have extensive training in cyber crimes, hold numerous certifications regarding cyber and digital investigations, and have conducted numerous cyber investigations with a focus on social media. I am also a certified Liaison Officer with the Virginia Fusion Center. To obtain my certification, I participated in training focused significantly on gang investigations.

5.     During my career as a law enforcement officer, I have authored numerous affidavits in support of state search warrants, criminal complaints, and arrest warrants. As a TFO with the FBI, I have authored affidavits in support of federal criminal complaints.

6.     In addition, I am presently and have previously participated in numerous criminal investigations focused on firearms, drug trafficking violations, criminal street gangs, human trafficking, cyber security, and national security cases. I have had training on violations of Title

2

18, United States Code, Section 1961 *et seq.* (Racketeer Influenced and Corrupt Organizations Act); Title 18, United States Code, Section 1959 *et seq.* (Violent Crimes in Aid of Racketeering); Title 18, United States Code, Section 1951 *et seq.* (Racketeering); Title 18 United States Code, Section 921 *et seq.* (Firearms); and Title 21, United States Code, Section 841 *et seq.* (Drug Offenses).

7.    As a FBI TFO, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of, and to make arrests for, offenses in violation of Titles 18 and 21 of the United States Code.

8.    The facts in this affidavit come from my own investigation, observations, training and experience, and information obtained from other law enforcement officers and witnesses, including members of the gang under investigation and their associates. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1962 (RICO); Title 18, United States Code, Section 1959 (VICAR); Title 18, United States Code, Sections 922, 924 (Firearms Offenses); and Title 21, United States Code, Section 841 by the individuals listed herein. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband, or fruits of these crimes, as described in Attachment B.

## TECHNICAL BACKGROUND ON FACEBOOK

10.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish

3

accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users and sometimes with the general public.

11.     Facebook asks users to provide basic contact and personal identifying information to Facebook during the registration process or later.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

12.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

13.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

4

14.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

15.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

16.     Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages

5

through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

17.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

18.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

19.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

20.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

21.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

22.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are

6

free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

23.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

24.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

25.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

26.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

7

27.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).   In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.   Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

28.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of an offense (such as an enterprise) or, alternatively, to exclude the innocent from further suspicion.   In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, photographs, and other data retained by Facebook can indicate who has used or controlled the Facebook account.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.   Further, Facebook account activity can show how and when the account was accessed or used.   For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.   By determining the physical location associated with the logged IP addresses, investigators

8

can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "Friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

29.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### THE BLOODS OF DANVILLE, VIRGINIA

30.    Starting in 2017, the FBI, along with other federal agencies, the Danville Police Department ("DPD"), and the Pittsylvania County Sheriff's Office have been investigating gang-related violent crime and homicides in the Danville, Virginia area. During the course of this investigation, we have learned that multiple street gangs operate in the Danville area, including the "Nine Trey Gangsters" ("NTG") also known as "9-Trey" or "9-3"; "Norfside;" "Camp Grove Killas;" "Pull-Up Billys;" "Bully Billys;" and the "Milla Time Gangsters." These smaller street gangs are referred to as "sets," but are all affiliated with the Bloods, which is a nationally known

gang founded in Los Angeles in the 1970s as a response to the rise and dominance of the Crips street gang. The names of the sets have changed over time as the sets have evolved in Danville.

31.     It is believed that members of these Danville sets are closely associated, overlap, and act similarly, however, and thus, this affidavit will hereinafter refer to them collectively as "BLOODS." The BLOODS and their members are believed to have committed, and continue to commit, violations of federal criminal statutes including the following:

   a.  Title 18, United States Code, Section 1962 (RICO);

   b.  Title 18, United States Code, Section 1959 (VICAR);

   c.  Title 18, United States Code, Section 922(g)(1) (Possession of a Firearm by a Convicted Felon); and

   d.  Title 18, United States Code, Section 924(c) (Use of Firearm in Furtherance of a Crime of Violence)

32.     During the course of this investigation, the FBI has gathered evidence regarding the nature, scope, structure, and activities of the BLOODS. The sources of evidence include the following:

   a.  Review of the publicly available portions of various Facebook accounts maintained by gang members and associates;

   b.  Review of historical criminal activity of gang members and associates, as detailed in police reports and court records;

   c.  Jail calls between gang members and associates;

   d.  Letters from incarcerated gang members;

   e.  Evidence obtained from cellphone search warrants; and

   f.  Interviews with current gang members and associates.

10

33.     The BLOODS area violent criminal street gang operating in the Danville, Virginia area in the Western District of Virginia.  To date, the investigation into the BLOODS has revealed the following information:

a.  The BLOODS are among one of the most violent criminal organizations currently operating in the Danville area.  According to investigations by law enforcement, the BLOODS have committed various violent crimes, including armed burglary, robbery, arson, shootings of rival gang members, assaults, homicides, and witness intimidation.

b.  In addition to their violent criminal activity, the BLOODS derive income from drug distribution and sales of stolen firearms and property.

c.  BLOODS operate within a defined geographic territory within Danville. Territory can be marked by graffiti, hanging shoes, or other gang symbols.  It is believed that BLOODS are trying to maintain control over their territory.

d.  Members are initiated through "beat ins" that typically consist of a thirty-one second beating by multiple gang members.  A member can also be "blessed in" by doing a predetermined crime or list of crimes, such as a murder or a series of robberies.  Members can rarely leave the gang.  If a member wants to leave the gang, the member must be "beat out," which can be a beating that the member may not survive.

e.  As is typical with street gangs, the BLOODS commonly utilize a variety of unifying marks, manners, and identifiers, including "gang signs," which refer to hand gestures and tattoos that are specific to the gang organization.  These insignia include the 5-point star, which shows a relation to the People Nation (a

11

well-documented organization consisting of a combination of street gangs including Bloods). The BLOODS often identify themselves by using one hand to form a "b," this is believed to show they are members of a Bloods gang. BLOODS have also utilized the letters "DPDK," which is believed to stand for "Danville Police Department Killers," and have also been seen wearing clothing with the statement or the abbreviation on them. BLOODS also identifies themselves with the color red, as is typical with Bloods gangs nationally.

f. The BLOODS operate under a similar hierarchy and leadership structure. Generally, members are ranked based on seniority within the gang, amount of individual criminal activity, and other contributions to the gang. Members advance within the leadership structure. Different "positions" within the gang have different names, such as "one-star" or "002," which indicates the level that person holds within the gang structure. Each set has an identified leader at the top of the hierarchy.

g. The BLOODS function according to a set of rules contained in "books of knowledge." The books of knowledge describe such things as the leadership structure, codes, regulations (called "Dos and Don'ts"), and expectations of gang members.

h. BLOODS frequently possess firearms, including handguns and assault-style rifles. As is typical with street gangs, BLOODS show themselves brandishing these weapons in publicly available videos and in photographs on social media,

12

such as Facebook, in order to promote the gang's violent and intimidating image. BLOODS also use social media as a recruitment tool.

34. Because of their gang association and participation in various violent crimes, numerous BLOODS members and their associates are currently under investigation, and there is reasonable suspicion to believe the requested records will be relevant and material to the ongoing criminal investigation of the gang itself and of the aforementioned offenses.

## PROBABLE CAUSE: THE GANG AND FACEBOOK

35. During the course of this investigation (and in related Bloods investigations), we have learned and seen that BLOODS and associates regularly use Facebook as a means of recruitment, take credit for violent incidents, communicate with one another about their criminal behavior, promote the image of the gang, and schedule gang meetings.

36. For example, current gang members have stated that they use the Facebook Messenger portion of Facebook to communicate directly with other gang members to coordinate criminal activity, share information about a crime in progress, and provide surveillance or other intelligence to members in advance of a criminal act. (Based on my experience and training, such messages can still exist in Facebook's files even after such conversations or messages are deleted by the account holder.)

37. As another example, towards the end of April 2017, there was an increase in activity on Facebook regarding the BLOODS set called "Norfside." There are several individuals publicly claiming on Facebook to be a part of this set. On Facebook, Norfside members have expressed their willingness to kill for their gang. In one particular post, members explicitly stated that they were unconcerned with what set an individual belongs to, they would go to war with anyone, no matter the age of the individual.

13

38.     To help recruit additional members, BLOODS post rap videos and photographs reflecting members engaged in a desired lifestyle, such as members holding large amounts of cash, standing by or driving vehicles, and wearing jewelry.

39.     Based on my training and experience, and that of other law enforcement officers with training and experience in the investigation of violent gangs, your affiant knows that even with a lengthy passage of time or deletion of information from the publically accessible website by the user, Facebook stores the account holder's communications, including but not limited to, private messages, status updates, links to videos, photographs, notes, wall postings, friend lists, subscriber's full name, birth date, address, telephone numbers, contact e-mail addresses, screen names/profiles, account/user identification numbers, duration of account, and other personal identifiers going back multiple years. This nonpublic information stored by Facebook relating to the below Facebook account is likely to be of significant evidentiary value.

40.     In the course of investigating the BLOODS membership and activities, as well as various murders and violent crimes in the Danville area generally, the FBI and DPD have identified a number of Facebook accounts maintained by suspected BLOODS members and associates. Several of these, including the account listed below, had their privacy settings adjusted so that content was available to the public. In particular, the below account contained the following public content:

### Facebook Account "Ace Boogie" - (FACEBOOK ID 100007404642812)

a.  Your Affiant noted that "Ace Boogie" account as being listed as a Facebook unique address as (young.valenticeace) this name indicates to your Affiant that the owner of this account is claiming to be a member of Valentine Bloods a set of Bloods known to operate in Danville, Virginia.

14

b. Your Affiant has observed through Federal search and seizure warrants other known Bloods to post to their Facebook walls "aceboogey100 Free The #Gang 900_600." Your Affiant understands this to mean free "Ace Boogy" who is known to your Affiant to be incarcerated.

c. Your Affiant notes on his publicly available Facebook page, "Ace Boogie" displaying gang signs common to the Bloods street gang.

d. Your Affiant notes "Ace Boogie" in photos with other known Bloods gang members displaying firearms and gang signs.

e. Your Affiant notes "Ace Boogie" on Facebook pictured in a photograph with another male subject where a gun is displayed with the handle wrapped in a red bandana (commonly referred to as a Bloods flag).

41. Therefore, the contents of the Facebook accounts of known BLOODS would provide direct evidence of various violent and other crimes, including material intent evidence, and would also provide key enterprise evidence.

## CONCLUSION

42. Based on the foregoing information, your affiant submits that probable cause exists that the individual listed above has been engaging in activity that violates Title 18, United States Code, Section 1962; Title 18, United States Code, Section 1959; and Title 18, United States Code 924. I believe that the Facebook records being sought for the listed individual contain evidence of the criminal enterprise, as well as direct evidence of various federal crimes.

Respectfully submitted,

Devin Taylor, Task Force Officer
Federal Bureau of Investigation

15

Subscribed and sworn to before me on March, 14th 2018.

HONORABLE JOEL C HOPPE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Facebook user ID:

**100007404642812**

that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company

headquartered in Menlo Park, California.

SEALED



4:18mj00047

## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, e-mails, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)  All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  If any of the aforementioned Facebook pages are group accounts, all of the following information is requested: group identification number, a list of users currently registered to the group, and Group Contact Info, including all contact information for the creator and/or administrator/s of the group and a PDF of the current status of the group profile page.

(b)  All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)  All photos and videos uploaded by that user ID or Facebook accounts associated with the email addresses of the administrators, and all photos and videos uploaded by any user that have that user tagged in them together with any and all photos

2

identified by Facebook using Facebook's facial-recognition software to match the images uploaded by the user IDs;

(d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the account;

(l) All information about the user's access and use of Facebook Marketplace;

(m) The types of service utilized by the user;

3

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, §§ 1962 (Racketeering Influenced Corrupt Organizations Act), 18 United States Code, § 1959 (Violent Crimes in Aid of Racketeering), Title 18, United States Code, § 922(g) (Felon in Possession), Title 18, United States Code, § 924(c) (Use of Firearm in Furtherance of a Crime of Violence) involving the account identified in Attachment A, including information pertaining to the following matters:

a.     Evidence relating to the structure, membership, scope, and operations of the Bloods criminal enterprise or the structure, membership, scope, and operations of a rival or competing gang;

b.     Evidence relating to the membership, association or affiliation with a RICO or VICAR enterprise including any and all criminal activity associated with such enterprise;

4

c. Communications regarding threats, intimidation, tampering and violence with/against current and former members and associates of the Bloods or current and former members and associates of rival or competing gangs;

d. Communications regarding threats, intimidation, tampering and violence with/against witnesses, and law enforcement, including any attempts to impede or obstruct justice;

e. Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

f. Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

g. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

h. The identity of the person(s) who communicated with the user ID about matters relating to violations of Title 18, United States Code, § 1962 (Racketeering Influenced Corrupt Organizations Act); Title 18, United States Code, § 1959 (Violent Crimes in Aid of Racketeering); Title 18, United States Code, § 922(g) (Felon in Possession of Firearm); and Title 18, United States Code, § 924(c) (Use of Firearm in Furtherance of a Crime of Violence), including records that help reveal their whereabouts.